1  Samuel R. Miller (SBN: 66871)
   srmiller@sidley.com
2  Robert B. Martin III (SBN: 235489)
   rbmartin@sidley.com
3  **SIDLEY AUSTIN LLP**
   555 California Street, Suite 2000
4  San Francisco, California 94104
   **Telephone:**      **(415) 772-1200**
5  **Facsimile:**      **(415) 772-7400**

6  **Attorneys For Plaintiff COPART, INC.**

7

8              UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA

10                                                 ***JCS***

11
   COPART, INC., a California corporation,      CIVIL ACTION NO.:
12                                          )
                    Plaintiff,              )   CV **08      3393**
13                                          )
          v.                                )   **COMPLAINT**
14                                          )
                                            )
15                                          )
   AUTO AUCTION SERVICES CORP., a            )   DEMAND FOR JURY TRIAL
16  Maryland corporation,                   )
                                            )
17                  Defendant.              )
                                            )
18                                          )
                                            )
19                                          )
                                            )
20 ─────────────────────────────────────────)

21

22

23

24

25

26

27

28

   **COMPLAINT**

**INTRODUCTION**

1.      Copart, Inc. ("Copart") brings this action for damages (including treble damages) and injunctive and declaratory relief against defendant Auto Auction Services Corporation ("AASC") for conspiring with various co-conspirators—including Manheim Auctions, Inc. ("Manheim"), ADESA, Inc. ("ADESA"), their respective affiliates Total Resource Auctions ("TRA") and Insurance Auto Auctions, Inc. ("IAAI"), and the National Auto Auction Association ("NAAA")—to restrain competition and stifle innovation by implementing and perpetuating an illegal group boycott and/or refusal to deal against Copart—a new and innovative market entrant—in violation of the antitrust laws of the United States and California law.  The illegal conduct alleged herein affects the resale of used vehicles through vehicle auctions, which involve the resale of millions of vehicles (with a transaction value of billions of dollars) each year.

2.      An entrepreneur named Willis J. Johnson founded Copart in 1982, beginning with a single salvage auction[1] facility in Vallejo, California that auctioned total loss salvage vehicles for a handful of local insurance companies.  At the time, the salvage auction industry consisted entirely of local "mom and pop" operations that employed little or no advanced technology.  Recognizing significant opportunity to improve efficiency and service within the industry, Mr. Johnson pioneered the introduction of many innovative technologies and services at Copart, which over the years were widely imitated by its competitors.  Copart's innovative and technologically advanced service offerings resulted in dramatic growth for Copart, leading to an eventual initial public offering in 1994 on the NASDAQ stock exchange.

3.      In 2004, Copart revolutionized the salvage auction industry with the introduction of its VB2 (Virtual Bidding – Second Generation) technology.  VB2 enabled Copart to eliminate the traditional live auction format at its facilities nationwide, and in the process transformed Copart's buyer base from local to global.  Every quarter following the introduction of VB2, Copart has

---

[1]      The terms "salvage auction" and "whole-car auction" are terms of art in the vehicle auction industry.  In short, a salvage auction is an auction that primarily offers damaged used vehicles that are sold on a salvage title, or undamaged vehicles which were stolen but subsequently recovered after an insurance company made a total loss pay-off for the vehicle to the insured.  A whole-car auction is an auction that primarily offers used vehicles that are sold on a clean (unbranded) title and are operable with limited or no body damage.  These terms are further defined in paragraphs 39-40 below.

**COMPLAINT**                                                    1

1    enjoyed uninterrupted annual growth in its global buyer base, resulting in continuous annual

2    increases in average gross vehicle selling prices for its customers, the vehicle sellers. In 2007,

3    Copart introduced its VB2 technology in the United Kingdom, transforming the U.K. salvage vehicle

4    market in the process.

5        4.  In large part due to Copart's leading role as an industry innovator, the company is the

6    leading provider of salvage vehicle auction services in the United States and the United Kingdom,

7    selling over 1.5 million vehicles annually from 145 facilities to nearly 100,000 buyers from nearly

8    100 countries.

9        5.  Copart recently expanded its focus beyond salvage auctions when it started offering

10   "whole-car" auctions, looking to compete head-to-head with the two largest competitors in that

11   sector, Manheim and ADESA. However, as will be described, Copart's efforts to offer innovative,

12   Internet-based auction services to vehicle sellers are being thwarted by the refusal of defendant and

13   its co-conspirators to allow Copart access to an essential electronic network called AutoIMS.

14       6.  AutoIMS is an electronic vehicle inventory management system utilized by vehicle

15   sellers—in particular, fleet operators and fleet management companies, and national or regional

16   banks, finance companies, and leasing companies (collectively referred to as "fleets and finance

17   companies")—to manage the entire vehicle sales process, including consigning vehicles to auction

18   companies located across the United States, and exchanging information related to the vehicle and

19   its disposition (including the vehicle's title, inspection, condition, location, and sale status) with the

20   auction companies, using a single uniform electronic system and interface.

21       7.  AutoIMS is owned and operated by defendant AASC, which in turn is owned and

22   controlled by a consortium of major vehicle auction firms which compete with Copart, including

23   Manheim and ADESA. Because of the market dominance of the competing vehicle auctions who

24   own and operate AutoIMS, and because of the network effects enjoyed by AutoIMS, AutoIMS is the

25   industry standard, and fleets and finance companies are "locked-in" to utilizing AutoIMS.

26       8.  Most fleets and finance companies require the use of AutoIMS to consign their lease-

27   returned, repossessed, or retired fleet vehicles to vehicle auction companies. Many of Copart's

28   competitors, including Manheim, ADESA, and their respective affiliates TRA and IAAI, have access

**COMPLAINT**                                     2

to AutoIMS and receive frequent vehicle consignments through this electronic system.

9.    Because access to AutoIMS is an essential input to effective competition in the market, Copart requested access to AutoIMS. AASC responded by insisting Copart pay discriminatory and onerous access fees, including an initiation fee of $50,000 per location, which for Copart (with its 132 locations in North America) would amount to $6.6 million. This discriminatory demand is tantamount to denial of access to AutoIMS and was demanded by AASC with the express purpose of denying Copart access to this essential electronic network.

10.    On information and belief, Manheim, ADESA, and their respective affiliates TRA and IAAI, paid a nominal initiation fee for access to AutoIMS. Other vehicle auction firms in competition with Copart similarly paid nominal fees for access to AutoIMS.

11.    When Copart challenged the discriminatory nature of the initiation fee, an officer of one of the vehicle auction companies which owns and controls AutoIMS informed an industry executive that AutoIMS was designed to be a "moat around our castle" to prevent new competitors, such as Copart, from effectively providing vehicle auction services to fleets and finance companies. And when Copart requested access to AutoIMS on the same terms as those provided to Manheim, ADESA, and their respective affiliates TRA and IAAI, AASC refused.

12.    AASC also suggested to Copart that a decreased fee schedule might be available if Copart was a member of NAAA. Other competitors of Copart who are members of NAAA also informed Copart that they paid initiation fees for access to AutoIMS much less than the initiation fee quoted to Copart by AASC.

13.    But NAAA's current bylaws make it crystal clear that NAAA would not permit Copart to become a member. NAAA's bylaws are specifically written to exclude innovative vehicle auction companies like Copart. According to those bylaws, NAAA membership is purportedly limited to vehicle auction firms which: (i) conduct live "brick-and-mortar" physical auctions – those that use human auctioneers and require in-person attendance by bidders; and (ii) refuse to admit the public to their live auctions. Copart—a leading vehicle auction company with a global buyer base that offers auctions conducted exclusively over the Internet using an electronic auctioneer and opens some auctions to the public—is purportedly ineligible for membership under NAAA's stated bylaws.

**COMPLAINT**                                        3

14.     Much like AASC's discriminatory conditions for access to AutoIMS which are an effective denial of access, NAAA's membership criteria are purposefully employed to thwart competition and stifle innovation. Indeed, on information and belief, NAAA's bylaws are enforced in a discriminatory fashion so that vehicle auction firms—except Copart—have been admitted to NAAA or continue to be members notwithstanding their attempts to imitate Copart by introducing Internet-based auctions and conducting public auctions. As current members of NAAA, those companies have access to AutoIMS on favorable terms not available to Copart.

15.     Indeed, the two largest competitors of Copart in the vehicle auction industry—Manheim and ADESA, who have a collective market share in the relevant product market of 80%—are current NAAA members, even though they do not appear to meet NAAA's stated membership criteria. For example, on information and belief, both Manheim, TRA, ADESA, and IAAI have made attempts to imitate Copart by recently introducing and utilizing Internet-based auctions, as well as conducting auctions open to the general public, all in direct contravention of NAAA's stated membership criteria.

16.     AASC's discriminatory access rules, influenced and supported by the consortium of competitors who own AASC, individually and coupled with NAAA's discriminatory membership rules, unreasonably restrict competition in the relevant product market and have injured Copart, consumers and competition in that market. Those injuries result in fewer buyers bidding upon auctioned vehicles, lower sales prices at auction (and thus less money being realized by fleets and finance companies from vehicles), less services provided by the auction companies to fleets and finance companies, and higher auction fees charged to fleets and finance companies. Such actions, as alleged further below, constitute an illegal group boycott, a refusal to deal, and an unreasonable restraint of trade, in violation of federal antitrust law and California law.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

17.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 15(a) & 26, and 28 U.S.C. §§ 1331, 1337(a), 2201, & 2202. Copart brings this action to obtain injunctive and declaratory relief and to recover damages (including treble damages), costs of suit, and reasonable attorneys' fees arising from defendant's violations of Sections 1 and 2 of the

COMPLAINT                                    4

1  Sherman Act, 15 U.S.C. §§ 1-2. This Court has supplemental jurisdiction over the state law claims

2  pursuant to 28 U.S.C. § 1367.

3       18.    Venue is proper in this District pursuant to 15 U.S.C. §§ 22 and 28 U.S.C. § 1391(b),

4  because defendant AASC conducts business and supports member auctions in Fremont, California

5  and Hayward, California, both in Alameda County, California. Defendant thus resides, transacts

6  business, and is found in this District, and the interstate trade and commerce involved and affected

7  by the alleged violations of federal antitrust and state laws occurred in substantial part within this

8  District. Further, the acts complained of have had, and will have, substantial anticompetitive effects

9  in this District.

10       19.    Pursuant to N.D. Cal. Local Rules 3-5(b) and 3-2(c), the Court should assign this

11  action to the San Francisco or Oakland Division based on Alameda County's location.

12       20.    This Court has *in personam* jurisdiction over defendant AASC because of its

13  nationwide contacts and activities within this District, as well as its contacts with the State of

14  California.

<div align="center">

**PARTIES**

</div>

16       21.    Plaintiff Copart is a corporation in good standing organized and existing under the

17  laws of the State of California, with its principal place of business at 4665 Business Center Drive,

18  Fairfield, California. A public company since 1994, Copart is a leading and established provider of

19  salvage auction services in the United States, and is a relatively new competitor in the whole-car

20  auction business. As of July 1, 2008, Copart had 132 facilities in North America.

21       22.    Defendant Auto Auction Services Corporation ("AASC") is a corporation organized

22  and existing under the laws of the State of Maryland, with its principal place of business at 5901

23  Peachtree-Dunwoody Road, Suite A500, Atlanta, Georgia. Incorporated in 1997, AASC controls

24  AutoIMS, which is an industry-standard electronic vehicle inventory management system utilized by

25  vehicle sellers—in particular, fleets and finance companies—to consign vehicles for resale to vehicle

26  auction companies and to electronically store, transfer, and retrieve vehicle-identifying information

27  (such as a vehicle's title, inspection, condition, location, and sale status). AASC's shareholders are

28  all NAAA members and include Manheim, ADESA, ServNet Auction Group (a consortium of

independent auctions), and Independent Auto Auction Services Corporation (an entity representing the AASC ownership interests of a group of independent auctions).

**CO-CONSPIRATORS**

23.    Manheim Auctions, Inc. ("Manheim") is the largest provider of whole-car auction services in the United States and controls the largest market share of whole-car auction services in the United States. Founded in 1945, the company has 34,000 employees, 145 operating locations and 12 service centers worldwide, and in 2007 sold between five and six million used vehicles, facilitating transactions of more than $59 billion. Manheim is a founding member and shareholder of AASC, and on information and belief, a current or former employee of Manheim is now a senior executive officer of AASC. On information and belief, Manheim's market share in the relevant product market is approximately 60%.

24.    Total Resource Auctions ("TRA"), an affiliate of Manheim, was formed in or around 2005 to provide salvage auction services, and also offers whole-car auction services. As of March 2008, TRA had 55 salvage auction locations in North America.

25.    ADESA is the second largest provider of whole-car auction services in the United States and controls the second largest market share of whole-car auction services in the United States. In April 2007, ADESA was acquired by a private equity group, which also acquired IAAI. Both ADESA and IAAI became wholly-owned subsidiaries of the private equity group. As of March 2008, ADESA had 59 whole-car auction locations throughout North America. ADESA is also a founding member and shareholder of AASC. On information and belief, ADESA's market share in the relevant product market is at least 20%.

26.    Insurance Auto Auctions, Inc. ("IAAI"), an affiliate of ADESA, is a leading provider of salvage auction services in the United States. As of March 2008, IAAI had 145 salvage auction locations throughout North America.

27.    National Auto Auction Association, Inc. ("NAAA"), founded in 1948, is the premier industry trade association for vehicle auction companies, representing more than 370 such companies worldwide. NAAA's management ranks consist largely of Manheim and ADESA employees. The Secretary and Treasurer of NAAA are employees of ADESA and Manheim,

respectively, and seven of the eleven directors of the NAAA board of directors are affiliated with Manheim or ADESA. The chair of the NAAA Membership Standards Committee is also an ADESA employee.

28.    The acts alleged against defendant and its co-conspirators were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of defendant's and its co-conspirator's businesses or affairs.

29.    In addition to the co-conspirators specifically identified herein, various other persons and/or firms not named as defendants in this complaint participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance of those violations.

## THE RELEVANT MARKET

30.    There is a relevant product market for vehicle auction services utilized by fleets and finance companies to consign used vehicles for resale.

31.    AutoIMS is an essential electronic network facility that vehicle auction firms like Copart must have access to in order to compete effectively in the relevant product market.

32.    Much like telephone service, AutoIMS is subject to substantial network effects. Because of the large number of fleets and finance companies throughout the United States supplying vehicles to auction companies, it would be inefficient and uneconomical for each of those vehicle sellers to have a different inventory management network system connecting each seller with each auction company. Instead, a single compatible and standardized system is much more valuable to connect the many hundreds of fleets and finance companies with the vehicle auction companies spread across the United States. Thus, a fleet or finance company can consign a vehicle anywhere in the country to any vehicle auction company with access to AutoIMS through a compatible, standardized electronic system platform. This standardized platform allows fleet and finance companies to track and manage vehicles through each step of the auction process, exchange vehicle and auction data with the auction companies, and create standardized reports, all through a standard interface. Fleets and finance companies are not inclined to create or join an alternative system to AutoIMS because such an alternative system would not have the substantial network effects of AutoIMS and would also require significant costs to design, configure, and maintain an inventory

**COMPLAINT**                                    7

1  management system compatible between the fleet or finance company and each auction company it

2  might use.

3      33.    Thus, most fleets and finance companies who consign their vehicles to vehicle

4  auction companies use one—and only one—inventory management system to consign their used

5  vehicles. That system is AutoIMS. Established in or around 2000, AutoIMS has become entrenched

6  over the last eight years, and most fleets and finance companies require vehicle auctions to have

7  access to AutoIMS in order to do business in the relevant product market.

8      34.    Because of the substantial network effects and "lock-in" of AutoIMS, any attempt by

9  a vehicle auction company to create an alternative to AutoIMS faces high barriers to entry, including

10  prohibitively high costs to both develop an alternative system and convince fleets and finance

11  companies to transfer their business from AutoIMS to the alternative system. Because of AutoIMS's

12  entrenchment in the industry and the substantial network effects described above, the fleets and

13  finance companies would not be inclined to transfer their business to an alternative system, thus in

14  all likelihood causing the alternative to fail.

15      35.    Based upon the foregoing allegations, there is a lack of reasonably interchangeable

16  alternatives to AutoIMS. Indeed, there is no suitable substitute product that fleets or finance

17  companies can use to consign vehicles to various competing vehicle auctions. Because of the lack of

18  a suitable substitute product, there is no cross elasticity of demand between AutoIMS and any

19  alternative product.

20      36.    Because of its control of AutoIMS, defendant AASC and its co-conspirators wield

21  monopoly power over an essential input to effective competition in the relevant product market

22  defined above, and have exercised that monopoly power to exclude competition by demanding

23  discriminatory fees upon Copart for access to AutoIMS, a demand that is tantamount to denial of

24  access to AutoIMS. AASC has the motivation to wield such anticompetitive monopoly power

25  because it is owned and controlled by a consortium of horizontal competitors engaged in vehicle

26  auction services, and such competitors are motivated to exclude Copart from this essential electronic

27  network, to the detriment of consumers, competition, and Copart.

28      37.    The relevant geographic market is the United States.

COMPLAINT         8

## GENERAL ALLEGATIONS

**Background of the Vehicle Auction Industry**

38.    The vehicle auction industry provides commercial vehicle sellers an outlet to sell whole-car and salvage motor vehicles.

39.    "Whole-car" vehicles are used vehicles that are operable and have limited or no body damage.  Whole-car vehicles typically come from lease returns, fleet returns, repossessions, or dealer trade-ins.  In connection with the relevant product market, the supply of whole-car vehicles from fleets and finance companies typically consists of vehicles repossessed by finance companies from defaulting borrowers, vehicles returned to the leasing company by a lessee following a lease termination, and vehicles retired from service by operators of vehicle fleets.  Buyers of vehicles at traditional whole-car auctions typically consist of licensed used vehicle dealers.

40.    "Salvage" vehicles typically consist of vehicles acquired by insurance companies as part of the claims settlement process and are also referred to as "total loss vehicles."  These vehicles are typically either damaged vehicles where the cost to repair the vehicle exceeds the vehicle's pre-damage value, or stolen vehicles that were recovered following the payment of a theft claim by the insurance company.  Salvage vehicles are typically purchased by licensed vehicle dealers, licensed vehicle dismantlers, rebuilders, exporters, and scrap metal processors.

41.    A vehicle auction company provides multiple services for a vehicle seller.  The auction company will generally retrieve the vehicle from the vehicle seller and transport it to a physical location owned by the auction company, where the vehicle is inspected, readied for sale, and stored.  The auction company also handles any necessary administrative processing related to the vehicle's title.  Following completion of the title processing, the auction company will then sell the vehicle at auction, either through a live in-person "brick and mortar" physical auction or, in Copart's case, through an auction conducted over the Internet.  Following the sale of the vehicle, the auction company remits the vehicle sales proceeds to the entity that consigned the vehicle for sale, but charges a fee (either a flat fee or a percentage of the sales price) for the sale of the vehicle, after deducting any sales or services fees owed to the vehicle auction company.  Auction companies also typically charge a transaction fee to the new buyer of the vehicle.

**The Internet and the Vehicle Auction Industry**

42.    Prior to being sold at auction, the overwhelming majority of vehicles sold by vehicle auctions are transported to a physical location owned by the auction company, where the vehicle is stored and displayed to potential buyers prior to the auction.  Historically, vehicle auctions were held on a weekly basis at the auction company's "brick-and-mortar" facility.  Bidders physically present at the auction site would submit bids to the auctioneer as each vehicle was driven past the auction block, until the vehicle was sold to the highest bidder.

43.    The traditional live "brick-and-mortar" physical auction model—currently practiced by most auction companies (including all NAAA members)—has several inherent limitations, including:

(a)    Traditional live auctions require the use of costly licensed professional auctioneers, auctioneer assistants, and clerks to auction the vehicles, and a large part-time workforce to manage the crowds and drive vehicles through the auction lanes.

(b)    Traditional live auctions enable possible collusion among bidders, and collusion between bidders and the auctioneer, to artificially suppress the sale price, both of which are age-old problems in the vehicle auction industry, and which result in depressed returns for the seller.

(c)    Traditional live auctions impose significant time demands upon vehicle buyers, who are required to travel to and attend the live auction only to be forced to wait around for hours before the desired vehicle arrives at the auction block for sale.  The buyer also incurs significant expense for travel, meals, and lodging.

(d)    Traditional live auctions result in a limited buyer base due to the time and expense burdens previously described.  Inclement and severe weather conditions can also result in reduced auction attendance, resulting in lower sale prices for sellers.

(e)    Traditional live auctions require significant capital expenditures in underutilized assets in the form of cavernous drive-through warehouses and large parking lots to accommodate bidders on sale day, all of which are idle the other six days of the week when a live auction is not being conducted.

44.    The Internet provided an opportunity to revolutionize the vehicle auction industry,

and Copart seized upon that opportunity.  In 2004, Copart introduced an auction-style Internet sales technology called VB2 (Virtual Bidding – Second Generation) that retained the excitement, action, and competitive feel of a live auction while eliminating potential collusion among bidders and auctioneers, eliminating the expenses associated with costly infrastructure and hiring professional auctioneers and support staff, and allowing bidders to view and bid on vehicles anywhere in the world from the convenience of their home or office.  By 2004, all of Copart's auction facilities in the United States were converted to exclusively to VB2.

45.    Today Copart is the only vehicle auction company that sells 100% of its vehicles from its locations exclusively through the use of an Internet-only auction sales platform.  Following Copart's transition to a pure Internet auction format, Copart's buyer base has consistently expanded, and is now comprised of nearly 100,000 buyers from nearly 100 countries.  Whereas in the past, vehicles at Copart were primarily purchased by bidders who lived near the Copart facility where the vehicle was stored, currently over 25% of all vehicles sold at Copart are purchased by exporters located outside the United States, and another 25% are purchased by buyers located outside the state where the vehicle was stored.  Through VB2, Copart's buyers can "virtually" attend and participate in multiple Copart auctions simultaneously from anywhere in the world using an Internet connection.  This dramatic expansion and globalization of Copart's buyer base since 2004 has resulted in a substantial increase in Copart's average vehicle sales price.

46.    The dramatic expansion and globalization of Copart's buyer base since 2004 increased the competition in each auction, resulting in a substantial increase in Copart's average vehicle sales price.  That is, Copart's Internet auction format generally results in a substantially higher sales price for each vehicle as compared with a live, "brick-and-mortar" physical auction.  That higher sales price directly benefits the vehicle seller, the ultimate customer of vehicle auction services, and also directly benefits competition by removing the inefficiencies inherent in "brick-and-mortar" physical auctions.

47.    Copart's competitors have attempted to imitate Copart's move to Internet-only auctions by implementing their own Internet-based auction services, although those Internet services are primarily "simulcast" auctions whereby the old-fashioned brick and mortar physical auction of a

1 | vehicle is broadcast simultaneously over the Internet, such that in-person physical bidders and

2 | Internet bidders compete to purchase the vehicle.

3 | **The Creation of AutoIMS**

4 |     48.    In or around 1997, a consortium of competing vehicle auction companies—consisting

5 | entirely of NAAA members, including Manheim and ADESA—founded AASC for the purpose of

6 | designing an industry-standard electronic inventory management system for the vehicle auction

7 | industry. AASC continues to be owned and controlled by its shareholders, all of which are vehicle

8 | auction companies competing with Copart, including Manheim and ADESA.

9 |     49.    Shortly after its founding, AASC—with the assistance of its shareholder vehicle

10 | auction companies—designed AutoIMS. AASC billed AutoIMS as "a non-proprietary system that

11 | *was developed for the entire auction industry*" and emphasized the value of AutoIMS to fleet and

12 | finance companies. In May 2000 around the time of AutoIMS's creation, the president of AASC

13 | stated: "National fleet management companies, lease companies, banks and finance companies are

14 | responsible for the remarketing of literally millions of off-lease vehicles each year. AutoIMS.com

15 | offers them a simple resource to monitor the status of each and every vehicle as its moves through

16 | the remarketing process."

17 |     50.    AutoIMS is now the standard inventory management system within the relevant

18 | product market. Most fleets and finance companies use AutoIMS as their only inventory

19 | management system in consigning their vehicles to vehicle auction companies. On information and

20 | belief, those fleets and finance companies *require* a vehicle auction company to have access to

21 | AutoIMS in order to receive their vehicle consignments. On information and belief, AASC

22 | emphasizes in its marketing materials that fleet and finance companies rely mainly upon AutoIMS

23 | for consignment of their vehicles.

24 |     51.    Thus, as alleged above, AASC, as owner and controller of AutoIMS, exercises

25 | monopoly power and controls access to an essential input to effective competition in the relevant

26 | product market.

27 |     52.    AASC provides subscription access to AutoIMS to vehicle auction companies for a

28 | one-time initiation fee, in addition to a smaller fee imposed for each vehicle auctioned by an auction

**COMPLAINT**           12

1   company. On information and belief, Manheim, ADESA, and their respective affiliates TRA and

2   IAAI paid a nominal initiation fee for access to AutoIMS. On further information and belief, a

3   nominal initiation fee is also available to vehicle auction companies that are members of NAAA.

4   **AASC Denies Copart Access to AutoIMS**

5          53.    Beginning in or around July 2007, Copart representatives attempted to negotiate with

6   AASC for fair and non-discriminatory access to AutoIMS by Copart. From July 2007 through April

7   2008, Copart representatives communicated on multiple separate occasions with AASC, primarily

8   through AASC's Chief Executive Officer, Don Meadows. AASC insisted that Copart would have to

9   pay an initiation fee of $50,000 per location. With Copart's 132 locations, the initiation fee would

10  amount to $6,600,000. That exorbitant initiation fee is tantamount to denial of access to AutoIMS

11  and, on information and belief, was demanded for the express purpose of denying Copart access to

12  AutoIMS. On information and belief, the demanded initiation fee is far beyond any initiation fee

13  paid by Manheim, ADESA, or their respective affiliates TRA or IAAI.

14         54.    Despite repeated requests to negotiate in the winter of 2007 and spring of 2008,

15  AASC refused to decrease the proposed $6.6 million initiation fee. Copart's attempts to negotiate

16  were met with stonewalling and pretextual excuses.

17         55.    Around the same time, an officer of one of the vehicle auction companies which owns

18  and controls AutoIMS informed an industry executive that AutoIMS was designed to be a "moat

19  around our castle" to prevent new competitors, such as Copart, from effectively providing vehicle

20  auction services to fleets and finance companies. This statement directly contradicted AASC's

21  earlier claim that AutoIMS was "developed for the *entire* auction industry."

22         56.    On information and belief, AASC is motivated to exclude Copart from access to

23  AutoIMS because AASC is owned and controlled by a consortium of horizontal competitors of

24  Copart, including Manheim and ADESA which possess a combined market share of around 80% in

25  the relevant product market. Those horizontal competitors thus exercise significant influence over

26  AASC. Moreover, on information and belief, AASC's Chief Financial Officer and Secretary is a

27  current or former employee of Manheim, further demonstrating the influence Copart's major

28  competitors wield over AASC. AASC thus imposed the discriminatory access terms upon Copart to

**COMPLAINT**                                    13

1    thwart Copart from competing in the relevant product market, to the detriment of Copart, consumers,

2    and competition.

3        57.    A national financial institution that consigns its vehicle supply through AutoIMS

4    recently stated to Copart that it wanted to consign some of its vehicles to Copart, but would not do so

5    because Copart did not have access to AutoIMS. The financial institution explained that because it

6    managed all of its vehicle inventory information and consignments exclusively through AutoIMS

7    and its information systems were designed to interact only with AutoIMS, it would not be cost

8    effective or efficient to connect with Copart through a separate inventory management system, even

9    if Copart offered and paid for the development of an alternative system. Copart later learned that the

10    financial institution began consigning vehicles through AutoIMS to a competitor of Copart with

11    access to AutoIMS.

12        58.    Another national financial institution also rejected business overtures by Copart

13    because Copart was not a member of AutoIMS.

14        59.    Copart has also been informed by some of its current customers that they are

15    considering consigning more vehicles to Copart's competitors because those competitors have

16    access to AutoIMS and Copart does not.

17        60.    Copart again demanded reasonable and non-discriminatory access terms to AutoIMS

18    on June 27, 2008. In its demand, Copart stated that AASC's refusal to permit Copart access to

19    AutoIMS on terms comparable to those of its competitors constituted an illegal group boycott and/or

20    refusal to deal. AASC rebuffed Copart's demand on July 9, 2008 with a response that parroted the

21    same pretextual excuses provided to Copart earlier.

22    **The Anticompetitive Actions by AASC and Its Co-Conspirators Caused Copart to Suffer**

23    **Antitrust Injury**

24        61.    AASC's access rules for AutoIMS unreasonably restrain trade and are not reasonably

25    necessary or tailored to make the relevant product market more efficient or effective nor to achieve

26    any other pro-competitive benefits. Indeed, it is against AASC's business interests to deny Copart

27    access to AutoIMS as the network effect exploited by AASC is strengthened with the addition of

28    each new member. Therefore, AASC's access rules are anticompetitive and, as a result, the fleets

COMPLAINT                14

1   and finance companies consigning vehicles through AutoIMS obtain lower sales prices on the

2   vehicles they consign, pay higher fees for auction services, have fewer choices among the types of

3   vehicle auction companies they may choose and the method of receiving the services those

4   companies offer, and cannot easily benefit from the innovations offered by vehicle auction

5   companies like Copart.

6       62.     AASC's anticompetitive and exclusionary conduct, assisted by Manheim, ADESA,

7   their respective affiliates TRA and IAAI, NAAA, and other unnamed co-conspirators, has directly

8   and proximately caused harm to Copart's business and property, a harm that has substantially

9   affected interstate commerce.  For example, two large national financial institutions have rejected

10  business overtures from Copart because Copart does not have access to AutoIMS.  Copart's injury is

11  of the type that antitrust laws are meant to prohibit, and thus constitutes antitrust injury.  Unless the

12  activities complained of are enjoined, Copart will continue to suffer injury for which Copart is

13  without adequate remedy at law.

14      63.     The actions of AASC, assisted by Manheim, ADESA, their respective affiliates TRA

15  and IAAI, NAAA, and other unnamed co-conspirators, to exclude Copart from accessing AutoIMS

16  on comparable terms as the competing vehicle auction companies, prevent Copart from effectively

17  competing in the relevant product market.  Specifically, AASC's efforts to deny Copart from

18  accessing AutoIMS prevent Copart from:

19      •    obtaining a substantially increased volume of consigned vehicles from fleets and

20           finance companies;

21      •    enjoying increased efficiencies in Copart's operations;

22      •    providing increased vehicle auction services to vehicle sellers; and

23      •    obtaining increased economies of scale, among other benefits.

24      64.     The foregoing acts have harmed consumers and competition by limiting the number

25  of buyers bidding upon auctioned vehicles with a concomitant decrease in the sales price of the

26  auctioned vehicles (and thus less money being realized by the fleets and finance companies who

27  consigned the vehicle for auction), limiting the services provided by the auction companies to fleets

28  and finance companies, imposing higher auction fees charged to fleets and finance companies,

1  limiting the ability of fleets and finance companies to lessen their exposure to potential collusion

2  among bidders and between bidders and auctioneers, stifling innovation, raising transaction costs,

3  and artificially maintaining auction fees for physical auctions above what would exist but for the

4  anticompetitive conduct alleged herein.

5       65.     Defendant's anticompetitive conduct as alleged herein has occurred in interstate

6  commerce and has substantially restrained trade and commerce among the States and in the markets

7  identified, and will continue to do so in the future unless prohibited by the Court.

8  <center>**CLAIMS FOR RELIEF**</center>

9  <center>**COUNT I**</center>

10  <center>**For Violation of 15 U.S.C. § 1**</center>

11       66.     Copart incorporates by reference each and every allegation contained above as though

12  fully set forth herein.

13       67.     Beginning in 2007, the exact date being unknown to Copart, and continuing thereafter

14  into the present, AASC and its co-conspirators, herein named and unnamed, by and through their

15  officers, directors, employees, agents, or other representatives, entered into a group boycott and/or

16  refusal to deal with Copart by imposing unreasonable, discriminatory, and arbitrary terms of access

17  to AutoIMS upon Copart.

18       68.     AASC did deal or offer to deal with one or more persons other than Copart, including

19  but not limited to Manheim and its affiliate TRA, ADESA and its affiliate IAAI, and other members

20  of NAAA, without the discriminatory and onerous terms.

21       69.     The group boycott and/or refusal to deal with Copart except on those discriminatory

22  and onerous terms were tantamount to a denial of access to AutoIMS, and were made pursuant to an

23  agreement between AASC and its co-conspirators, herein named and unnamed.

24       70.     At least two of the co-conspirators, namely Manheim and ADESA, are direct

25  competitors of Copart and collectively control around 80% of the market share in the relevant

26  product market.

27       71.     AASC possesses control of a unique business element necessary for effective

28  competition in the relevant product market, such that the group boycott and/or refusal to deal with

**COMPLAINT**              16

1    Copart except on the discriminatory and onerous terms disadvantaged Copart by denying Copart

2    access to a service, namely AutoIMS, necessary for Copart to compete effectively.

3        72.    The group boycott and/or refusal to deal occurred in and affected interstate

4    commerce.

5        73.    Copart was injured in its business or property because of the group boycott and/or

6    refusal to deal.

7        74.    By reason of the foregoing, AASC has violated Section 1 of the Sherman Act, 15

8    U.S.C. § 1, both as a *per se* offense and, if applicable, under the rule of reason.

9                                    **COUNT II**

10                          **For Violation of 15 U.S.C. § 2**

11        75.    Copart incorporates by reference each and every allegation contained above as though

12    fully set forth herein.

13        76.    AASC controls a facility, namely AutoIMS, that is essential to effective competition

14    in the relevant product market.  As a result of this control, AASC possesses monopoly power in the

15    relevant product market.  AASC, in concert with Copart's horizontal competitors (which own and

16    control AASC) has wielded this monopoly power to deny Copart access to an essential facility.

17        77.    AutoIMS could not practically or economically be duplicated by potential

18    competitors, including Copart.

19        78.    It is feasible for Copart to use AutoIMS without interfering with AASC's use or

20    significantly inhibiting AASC's ability to conduct its business.

21        79.    AASC denied Copart reasonable access to AutoIMS through the imposition of

22    discriminatory and onerous access terms which were tantamount to a denial of access.

23        80.    Denying reasonable access to AutoIMS was contrary to AASC's independent

24    business interests and has no legitimate business justification.

25        81.    AASC's refusal to grant Copart reasonable access to AutoIMS had the effect of

26    creating or maintaining monopoly power in the relevant product market.

27        82.    By reason of the foregoing, AASC has violated Section 2 of the Sherman Act, 15

28    U.S.C. § 2.

**COMPLAINT**                                    17

## COUNT III

### For Violation of California Business & Professions Code § 16720 *et seq.*

83.    Copart incorporates by reference each and every allegation contained above as though fully set forth herein.

84.    Beginning in 2007, the exact date being unknown to Copart, and continuing thereafter into the present, AASC and its co-conspirators, herein named and unnamed, by and through their officers, directors, employees, agents, or other representatives, entered into a group boycott and/or refusal to deal with Copart by imposing unreasonable, discriminatory, and arbitrary terms of access to AutoIMS upon Copart.

85.    AASC did deal or offer to deal with one or more persons other than Copart, including but not limited to Manheim and its affiliate TRA, ADESA and its affiliate IAAI, and other members of NAAA, without the discriminatory and onerous terms.

86.    The group boycott and/or refusal to deal with Copart except on those discriminatory and onerous terms were tantamount to a denial of access to AutoIMS, and were made pursuant to an agreement between AASC and its co-conspirators, herein named and unnamed.

87.    At least two of the co-conspirators, namely Manheim and ADESA, are direct competitors of Copart and collectively control around 80% of the market share in the relevant product market.

88.    AASC possesses control of a unique business element necessary for effective competition in the relevant product market, such that the group boycott and/or refusal to deal with Copart except on the discriminatory and onerous terms disadvantaged Copart by denying Copart access to a service necessary for Copart to compete effectively, namely AutoIMS.

89.    The group boycott and/or refusal to deal occurred in and affected a substantial amount of trade in commerce in California.

90.    Copart was injured in its business or property because of the group boycott and/or refusal to deal.

91.    By reason of the foregoing, AASC has violated California Business & Professions Code § 16720 *et seq.*

COMPLAINT                                                18

## COUNT IV

### For Violation of California Business & Professions Code § 17200 *et seq.*

92.    Copart incorporates by reference each and every allegation contained above as though fully set forth herein.

93.    AASC transacts business in California and operates and supports member auctions in several locations in California, including Fremont, Hayward, and other cities and counties.

94.    AASC and its co-conspirators engaged in a pattern of conduct of unfair and unlawful business practices, namely a group boycott of and/or refusal to deal with Copart, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. § 1-2, and California Business & Professions Code § 16720 *et seq.*

95.    Through that pattern of conduct, AASC and its co-conspirators improperly acquired increased profits and caused actual injury to Copart.

96.    Copart is thus entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by AASC and its co-conspirators as a result of such unfair business acts or practices.

97.    AASC's acts alleged above are acts of unfair competition in violation of California Business & Professions Code § 17200 *et seq.*

## COUNT V

### For Intentional Interference with Prospective Economic Relations

98.    Copart incorporates by reference each and every allegation contained above as though fully set forth herein.

99.    There existed an economic relationship between Copart and other fleets and finance companies containing a probability of future economic benefits accruing to Copart.

100.    AASC and its co-conspirators had knowledge of the economic relationship specified above.

101.    AASC and its co-conspirators maliciously and intentionally acted to disrupt the economic relationship specified above.

102.    Those intentional acts by AASC and its co-conspirators constituted a group boycott

COMPLAINT                                    19

and/or refusal to deal in violation of federal antitrust law and California law.

103.    Those intentional acts by AASC and its co-conspirators actually disrupted the economic relationship specified above, and that disruption proximately caused damages to Copart.

104.    By reason of the foregoing, AASC intentionally interfered with Copart's economic relations and is therefore liable under tort to Copart in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Copart respectfully prays that this Court:

105.    Preliminarily and permanently enjoin and restrain defendant, its subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on its behalf, from committing, continuing, or maintaining, such violations of the antitrust laws of the United States and California as alleged herein;

106.    Issue a declaratory judgment that defendant's conduct is unlawful in violation of Sections 1 and 2 of the Sherman Act and California law;

107.    Award actual and compensatory damages, to be trebled according to 15 U.S.C. § 15(a) and Cal. Business & Professions Code § 16750, in favor of Copart against defendant for all damages sustained as a result of defendant's wrongful conduct as alleged in Counts I, II, and III;

108.    Award restitution in favor of Copart against defendant for all damages sustained as a result of defendant's wrongful conduct as alleged in Count IV;

109.    Award actual and compensatory damages in favor of Copart against defendant for all damages sustained as a result of defendant's wrongful conduct as alleged in Counts V;

110.    Award punitive damages in favor of Copart against defendant for defendant's wrongful and malicious conduct as alleged in Count V;

111.    Award to Copart its reasonable costs and expenses incurred in this action, including attorneys' fees, expert fees, and costs of suit;

112.    Award to Copart interest on its actual damages pursuant to 15 U.S.C. § 15(a) and California Business & Professions Code § 16750;

113.    Award such equitable, injunctive, or other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Copart hereby demands a trial by jury on those claims triable by jury.

Dated:  July 14, 2008                              SIDLEY AUSTIN LLP


By:  _____
     Samuel R. Miller
     Attorneys For Copart, Inc.